UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARLOS URIAS,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant(s).

Case No.  CV 22-1680-KK-PVCx

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

On March 14, 2022, plaintiff Carlos Urias ("Plaintiff") filed a Complaint against defendant United States of America ("Defendant") for negligence arising from a car accident in violation of the Federal Tort Claims Act.  ECF Docket No. ("Dkt.") 1. On March 18, 2024, and March 19, 2024, the matter was tried before the Court without a jury.  Dkts. 78, 79.

Having considered all the evidence admitted at trial – including the Declarations of Expert Testimony, dkts. 62-68, and the briefing submitted by the parties, dkts. 86, 87 – the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

# I.
## FINDINGS OF FACT

**A.     PROCEDURAL HISTORY**

1.     On March 14, 2022, Plaintiff filed a Complaint alleging a single cause of action for negligence under the Federal Tort Claims Act, seeking damages for past and future medical expenses, property damage, loss of income and earning capacity, and general damages.  Dkt. 1.

2.     On December 18, 2023, Defendant filed two Motions in Limine seeking to exclude (1) Plaintiff's non-retained expert witness ("Motion in Limine 1"); and (2) "all testimony and evidence at trial of Plaintiff's claimed past and future lost earnings" ("Motion in Limine 2").  Dkts. 36, 40.  Plaintiff filed an Opposition to Defendant's Motion in Limine 1, but failed to file an Opposition to Motion in Limine 2.  Dkt. 51.  On February 29, 2024, the Court denied Defendant's Motion in Limine 1 and granted Motion in Limine 2 due to Plaintiff's failure to oppose.  Dkt. 54.  Thus, Plaintiff was precluded from offering any testimony or evidence of Plaintiff's past and future lost earnings.  Id.

3.     On March 18 and 19, 2024, the parties appeared for trial before this Court and presented witness testimony.  Dkts. 78, 79.  The Court received testimony from:  Carlos Urias, Carlos Urias, Jr., Wilfredo Escobar, and Dr. Serge Obukhoff.  Dkt. 80.  The Court additionally received testimony both in Court and by declaration from:  Dr. Lester Zackler, Dr. Neil Ghodadra, Dr. Ilan Danan, Dr. Geoffrey Miller, Lindsay Knutson, and Dr. Jeffrey Schaeffer.  Dkts. 62, 64-68, 80.

4.     After the close of evidence, the Court ordered the parties to file Proposed Findings of Facts and Conclusions of Law no later than April 15, 2024.  Dkt. 79.

5.      On April 15, 2024, Defendant filed its Proposed Findings of Fact and Conclusions of Law.  Dkt. 86.  On April 16, 2024, Plaintiff filed his Proposed Findings of Facts and Conclusions of Law.  Dkt. 87.

**B.     BACKGROUND**

    **i.     Accident**

6.      On October 17, 2020, around 7:00 p.m., Wilfredo Escobar, an employee of the United States Postal Service ("USPS"), was driving a USPS postal truck on Laurel Canyon Boulevard in Los Angeles, California, when he struck the back rear bumper of a 2020 Toyota Camry Plaintiff was driving (the "Camry").  Dkt. 83, Trial Transcript, Day 1 ("T1") at 57-62; Dkt. 84, Trial Transcript, Day 2 ("T2") at 239.

7.      Escobar testified he "was getting ready to turn right," "the light turned red," the Camry in front of him "start[ed] stopping," Escobar's postal truck "was kind of close from [Plaintiff's]," and then Escobar's vehicle hit the Camry.  T2 at 239.  As described in the USPS Accident Report, Escobar "in [his] rear view mirror noticed [a] vehicle approaching was coming at [a] high speed[.]"  Ex. 52 at 12.  Escobar "tried to move ahead to complete [the] right turn in [an] attempt to avoid getting rear ended and failed to check clearance and [the Camry] ahead stopped and [his postal truck] rear ended [the Camry]."  Id.  Escobar estimated he was driving about five miles per hour at the moment of impact.  T2 at 241.

8.      Plaintiff testified that prior to the accident, he was "stopped completely" and leaning over to retrieve a pack of gum from the driver's door side pocket.  T1 at 60.  The collision caused Plaintiff to hit the left side of his forehead against the driver's side window.  Id.; Ex. 222 at 3.  Plaintiff testified he was in shock and confused and felt "something hot" on the left side of his head.  T1 at 68-69.  Escobar testified Plaintiff did not appear to be unconscious in the car following the collision.  T2 at 242.

9.      Plaintiff testified he exited the Camry and observed Escobar's postal truck behind him, the postal truck's round side-mirror on the ground, and Escobar on the phone with his supervisor.  T1 at 61-63, 65.  Plaintiff testified he spoke to Escobar, who informed Plaintiff his supervisor would meet them at the scene to prepare a report.  Id. at 65.  After the initial interaction, Plaintiff and Escobar moved their cars to the curb.  Id. at 69-70; T2 at 243-244.  Plaintiff estimated he drove his car about 80-100 feet.  T1 at 69-70.  Escobar testified that when Plaintiff exited the car he did not appear to be dazed, dizzy, or in pain, and he never asked for medical attention.  T2 at 243-244.

10.     Approximately seven to ten minutes after Escobar's call, his supervisor arrived on the scene and spoke to both Escobar and Plaintiff.  T1 at 65-66; T2 at 248.  Escobar's supervisor prepared a report detailing the accident and showed Plaintiff the completed report.  T1 at 66; Ex. 52 at 8-14.  The report noted the accident was not serious.  Ex. 52 at 11 ("Serious Accident:  No").  The report additionally documented any "Unsafe practice(s)," which noted for Plaintiff, "No unsafe practice," and for Escobar, "Failure to check clearance."  Id. at 11-12.

11.     Escobar estimated the entire interaction with Plaintiff following the accident lasted approximately 30 minutes.  T2 at 244.  There was no evidence presented that either Plaintiff or Escobar called the police to report the accident.  At the end of the interaction, Plaintiff called his son to ask him to drive him home.  T1 at 69-70.  Plaintiff did not seek medical treatment that evening.  Id.

12.     The collision caused damage to the rear bumper and undercarriage of the Camry.  T1 at 35.  The collision also dislodged one of the side mirrors on the USPS truck.  Id. at 63-65.  Carlos Urias, Jr., the owner of the Camry, testified the total damages to the Camry was $4,234.26 according to documentation from his insurance

company.  T1 at 35.  Of that amount, he paid $1,000 to cover his insurance deductible.  Id.

### ii. Medical Treatment

13.     On October 18, 2020, the day after the accident, Plaintiff began developing pain in his neck and back.  T1 at 71.

14.     On October 19, 2020, Plaintiff sought treatment from Dr. Jack Demirchian, a chiropractor.  Ex. 216.  On the intake form, Plaintiff indicated pain in his neck, waist, and upper and mid back.  Id. at 3.  Plaintiff additionally listed the name and contact information for an attorney.[1]  Id. at 1.  Dr. Demirchian treated Plaintiff "on 35 occasions from October 19, 2020, to February 10, 2021."  Dkt. 64, Declaration of Geoffrey Miller ("Miller Decl."), ¶ 25; Dkt. 66, Declaration of Jeffrey Schaeffer ("Schaeffer Decl."), ¶ 42.

15.     On October 31, 2020, Plaintiff had an MRI brain scan completed by Allstar Imaging.  Ex. 222 at 5.

16.     On October 31, 2020, Plaintiff presented to the Providence Holy Cross Medical Center Emergency Department ("Providence Medical Center").  Ex. 222.  Plaintiff reported he "had recurrent dizziness and feels disoriented at times, and describe[d] a noise in the left side of his head."  Id. at 3.  Plaintiff also complained of "mid back pain," but "denie[d] headache."  Id. at 7, 8.  The records further note "there was no loss of consciousness" from the accident.  Id. at 3.  Doctors also reviewed Plaintiff's MRI and determined the MRI showed a "subdural hematoma," but "[n]o evidence of acute intracranial infarct, hemorrhage, midline shift or mass effect."  Id. at 5.  While at Providence Medical Center, Plaintiff received a head CT scan, which also revealed a "large subarachnoid cyst," but "[o]therwise [a] normal

---

[1] The attorney noted on the initial form is different than Plaintiff's current counsel.  See Ex. 216 at 1.

examination." Id. at 6, 7.  Plaintiff was diagnosed "with concussion, which likely occurred 2 weeks ago [following collision] . . . epidural hematoma, subdural hematoma or arachnoid cyst," and he was discharged the same day.  Id. at 7, 8.

17.     On November 9, 2020, Plaintiff was seen by a neurologist, Dr. Grigor Harutunian.  Ex. 225.  According to Dr. Harutunian's consultation report and Plaintiff's description of the collision, Plaintiff reported "striking the left side of his head and feeling dazed," but "[h]e remained conscious." Id. at 3.  The report indicated Plaintiff had developed headaches since the accident and "experiences some nausea with the pain," but "[d]enies vomiting." Id.  Plaintiff also reported "episodic dizziness," "difficulty focusing and concentrating," and "developing ringing sounds from his ears along with noise sensitivity." Id.  Dr. Harutunian found Plaintiff's "symptoms are postconcussional." Id. at 5.  Dr. Harutunian referred Plaintiff to "see a Neurosurgeon ASAP" due to the subdural hematoma shown on Plaintiff's MRI and recommended a "repeat CT Brain." Id.  Dr. Harutunian recommended Tylenol for pain, OTC Migrelief for headaches, OTC Vertisil and Meclizine for vertigo, adequate rest, and avoidance of contact activities or labor. Id.

18.     On November 11, 2020, Plaintiff received a CT head scan from Precise Imaging.  Miller Decl., ¶ 34; Dkt. 65, Declaration of Ilan Danan ("Danan Decl."), ¶ 7.h; Schaeffer Decl., ¶ 40.

19.     On November 12, 2020, Plaintiff was evaluated by neurosurgeon, Dr. Serge Obukhoff.  Ex. 226.  During the evaluation, Plaintiff complained of headaches, difficulties with balance, nausea, episodes of vomiting, and noise inside of his head. Id. at 1, 3; T2 at 199.  Dr. Obukhoff testified that Plaintiff told him "during the accident, . . . he lost consciousness briefly . . . . and after that, when he returned his consciousness, very shortly, he started developing these problems." T2 at 199.  During a physical examination of Plaintiff's lower extremities, Dr. Obukhoff found

"[n]o problem in [Plaintiff's] neck and back," but Plaintiff complained of lower back pain.  Ex. 226 at 4.  As to Plaintiff's balance, Dr. Obukhoff further found Plaintiff was "not stable," but Plaintiff had "no other focal neurological symptoms."  T2 at 200.

20.     Dr. Obukhoff reviewed Plaintiff's MRI and CT scans and determined Plaintiff had "a large cyst" that likely developed in his early childhood.  Ex. 226 at 4.  However, Dr. Obukhoff noted "there are no signs of contusion to the brain or hemorrhages."  Id.  After the evaluation, Dr. Obukhoff concluded Plaintiff's "diagnosis is cerebral concussion with brief loss of consciousness immediately after the accident and development of symptoms consistent with postconcussion syndrome."  Id.  Based on Plaintiff's claim that he lost consciousness, Dr. Obukhoff opined that the concussion was "rather significant."  T2 at 202 ("And I would say even the brief loss of consciousness during – when he hit his head against the – the window in his car, it's rather a significant concussion because, as I mentioned earlier, a loss of consciousness, even brief loss of consciousness, indicates that he was shaken very severely and brain cut down basically consciousness for short period of time.").  Notably, Plaintiff's claim that he lost consciousness contradicted his earlier claims to Dr. Hartunian and the doctors at Providence Medical Center.  See Ex 225 at 3; Ex. 222 at 3.

21.     Dr. Obukhoff recommended Plaintiff "slow down" and take Tylenol.  Ex. 226 at 4.  He saw "no indication for surgical treatment" and found Plaintiff "at that stage, did not need any emergency treatment or urgent treatment as a result of th[e] accident."  Id.; T2 at 218.  Based on Plaintiff's complaints of back pain, Dr. Obukhoff referred Plaintiff for a lumbar spine MRI.  Ex. 226 at 4.

22.     On December 6, 2020, Plaintiff had a cervical spine MRI.  Miller Decl., ¶ 40.

23.     On December 17, 2020, Dr. Obukhoff re-evaluated Plaintiff.  T2 at 205. Plaintiff reported feeling a bit better, but that his symptoms persisted – specifically his headaches and balance issues.  Id.  Dr. Obukhoff recommended Plaintiff return in one month.  Id. at 205-206.  He did not review Plaintiff's cervical MRI.  Id. at 205.

24.     From December 21, 2020 to July 13, 2021, Plaintiff was treated by Dr. Roy Nini and Dr. Paul Lee with injections for pain management.  Danan ¶ 7.l; Schaeffer Decl., ¶ 42.  Plaintiff testified he received injections from Dr. Roy Nini to help with his neck and back pain.  T1 at 83-84.  Plaintiff testified the injections themselves were quite painful and did not fully alleviate his pain.  Id. at 84-85.

25.     On February 27, 2021, Dr. Demirchian discharged Plaintiff from chiropractic care.  Schaeffer Decl., ¶ 42.  Plaintiff "reportedly made improvement, but had persisting symptoms in his head, neck, and lumbar spine region."  Id.

26.     On May 12, 2021, Plaintiff was evaluated by neurosurgeon, Dr. Parham Yashar.[2]  Dkt. 67, Neil Ghodadra ("Ghodadra Decl."), ¶ 38; Danan Decl., ¶ 7.m.

27.     On May 28, 2021, Plaintiff was evaluated by neurologist, Dr. Leon Barkodar.[3]  Ghodadra Decl., ¶ 41; Danan Decl., ¶ 7.n.

28.     On August 4, 2021, Plaintiff was evaluated by Otolaryngologist, Dr. Stephen Grifka.[4]  Miller Decl., ¶ 69.  Plaintiff testified Dr. Grifka recommended Plaintiff schedule a follow-up appointment, but an appointment was never scheduled. T1 at 116.

---

[2] No records or testimony from Dr. Yashar's treatment was entered into evidence.

[3] No records or testimony from Dr. Barkodar's treatment was entered into evidence.

[4] No records or testimony from Dr. Grifka's treatment was entered into evidence.

29.     On January 28, 2022, Plaintiff was evaluated by clinical psychologist, Ronald Kaufman.[5]  Schaeffer Decl., ¶ 47.

30.     On July 28, 2022, Plaintiff returned to Providence Medical Center.  Ex. 223.  Plaintiff reported a headache that "got[] progressively worse over [the] past 3-4 days."  Id. at 7.  Plaintiff reported "his balance has been off since [the] accident but . . . [symptoms] have worsened recently."  Id.  Plaintiff was given a limited prescription for Norco for pain and discharged.  Id. at 6.

31.     On September 21, 2022, Plaintiff was re-evaluated by Dr. Yashar.  Ghodadra Decl., ¶ 59.d.; Danan Decl., ¶ 7.p.

32.     On March 23, 2023, Dr. Neil Ghodadra, a board-certified orthopedic surgeon and certified life care planner, evaluated Plaintiff and completed a comprehensive orthopedic examination, with an emphasis on Plaintiff's cervical spine.  Ghodadra Decl., ¶¶ 12, 13.  Plaintiff testified Dr. Nini had referred Plaintiff to a surgeon for evaluation because Plaintiff's pain persisted.  T1 at 86.  On the date of the evaluation, Plaintiff complained of pain in his neck and lower back.  Ghodadra Decl., ¶ 12.  Dr. Ghodadra referred Plaintiff to Dr. Greg Khounganian for a surgical consultation because Plaintiff "remained symptomatic despite the conservative treatments he received in the form of therapy, medication, and pain management injections."  Id. ¶ 14.

33.     On May 4, 2023, Plaintiff was evaluated by spine surgeon, Dr. Khounganian.[6]  Ghodadra Decl., ¶ 15.

---

[5] No records or testimony from Dr. Kaufman's treatment was entered into evidence.

[6] No records or testimony from Dr. Khounganian's treatment was entered into evidence.

34.     On June 1, 2023, Plaintiff was again evaluated by Dr. Khounganian. Ghodadra Decl., ¶ 15.

35.     On June 15, 2023, Plaintiff was re-evaluated by Dr. Ghodadra for neck and back pain.  Ghodadra Decl., ¶ 17.  Dr. Ghodadra found the "following areas of concern:  general weakness, fatigue, headache, neck pain, positive muscle spasms, positive joint pain, stiffness, backache, and limitations of range of motion."  Id. ¶ 18. Dr. Ghodadra "agree[d] with Dr Khounganian's assessment that [Plaintiff] will benefit from a cervical fusion C4-C7," and recommended that Plaintiff "be seen again by pain management for repeat Lumbar injections." Id. ¶¶ 22, 23.  Dr. Ghodadra further opined that "if [Plaintiff] fails Lumbar injections, he is a candidate to be seen by the spine surgeon for lumbar disectomy surgery, or, in the alternative, implantation of a spinal cord simulator." Id. ¶ 23.  However, Plaintiff testified that, while surgery was recommended, he chose not to have the surgery because of the risks involved.  T1 at 87.

36.     On August 7, 2023, and August 8, 2023, Dr. Lester Zackler, a clinical and forensic neuropsychiatrist specializing in the evaluation and treatment of the biopsychosocial consequences of illness and trauma, conducted a psychological evaluation of Plaintiff, which included a comprehensive interview and two psychological measures, (1) the Millon Clinical Multiaxial Inventory-IV; and (2) the MMPI-2, the Minnesota Multiphasic Personality Inventory.  Dkt. 68, Declaration of Lester Zackler ("Zackler Decl."), ¶ 24.

37.     The interpretive report regarding the MMPI-2 stated: "The client answered the MMPI-2 items in such a way as to invalidate the test.  He answered an unusually large number of extreme items in the deviant direction; an indiscriminate and exaggerated response pattern is probable.  Individuals who produce such deviant patterns cannot be clearly evaluated by the resulting profile." Id. ¶ 27.

38.     The interpretive report regarding the MCMI-IV stated: "This patient's response style may indicate a tendency to magnify illness, an inclination to complain, or feelings of extreme vulnerability associated with a current episode of acute turmoil. The patient's scale scores may be somewhat exaggerated, and the interpretations should be read with this in mind." Id. ¶ 28.

39.     On October 5, 2023, Dr. Zackler conducted a second interview with Plaintiff and Plaintiff's wife. Id. ¶ 32. Dr. Zackler talked to Plaintiff about "using medications to treat his anxiety, depression, pain, and sensitivity to threat." Id. ¶ 33. Dr. Zackler prescribed Cymbalta for Plaintiff's anxiety, headaches, pain, and nausea. Id. ¶ 38. Plaintiff reported he had previously not been on any medication other than Tylenol. Id. ¶ 33.

40.     On February 13, 2024 and February 27, 2024, Dr. Zackler conducted a subsequent evaluation of Plaintiff to assess his response to Cymbalta. Id. ¶ 40. Plaintiff reported "improved mood, but persistent disequilibrium and fear of reinjury." Id. ¶ 41. Plaintiff reported "[h]e has been unable to return to work as a labor/handyman due to his fears of reinjury." Id. ¶ 58. Plaintiff reported "[h]is emotional and cognitive symptoms have stressed his marriage, as has his inability to return to work." Id. Plaintiff further reported "[h]e has become socially isolated and withdrawn." Id.

iii.    **Defense Medical Expert Witness Testimony**

a.    **Dr. Jeffrey Schaeffer**

41.     On May 29, 2023, Dr. Jeffrey Schaeffer, a clinical neuropsychologist – specializing in traumatic brain injury, behavior toxicology, praxeology and geriatrics, and the neuropsychology of medical illness – conducted a neuropsychological examination of Plaintiff and reviewed Plaintiff's medical records. Schaeffer Decl., ¶¶ 1, 16. Dr. Schaeffer concluded Plaintiff "sustain[ed] a mild but Complicated

Traumatic Brain Injury with a defined subarachnoid thin-sheet bleed, (as documented by a subsequent Magnetic Resonance Imaging Scan-MRI) close in time following his complex mild traumatic brain injury, of fairly substantial dimensions measured in centimeters, but constituting a less significant 'thin-sheet' bleed without evidence of any significant continuation of bleeding." Id.  He noted "[i]t appeared that [Plaintiff's] bleed . . . occurred in close proximity to his small benign-appearing congenital subarachnoid cyst, without any need for further care." Id. ¶ 24.

42.     As to future medical concerns, Dr. Schaeffer noted "the proximate medical records from either of the two initial Emergency Department visits[7] failed to identify any claimed or objectively documented abnormalities of a neurological, cognitive, or of a mental status nature[.]" Id. ¶ 60.  He concluded, "[a]t that point, closer in time to the accident, it appeared that only headaches, as well as the neck and back pain, remained as subjective symptoms reported by [Plaintiff]." Id.  He further concluded "there appeared to be no other current objective documentation of ongoing Cognitive or Psychiatric injuries, conditions, or deficits, that would have been caused by, or associated with, the continuing sequelae of a traumatic brain injury of any severity (even in the presence of the documented thin-sheet subarachnoid bleed adjacent to the congenital cyst), as documented by [the] early Brain MRI." Id. ¶ 24.

43.     In addition to reviewing Plaintiff's medical records, Dr. Schaeffer also administered a Psychometric Assessment to Plaintiff and found Plaintiff "*did not pass any* of the performance validity measures (PVTs), which is a[n] extremely unusual finding actually, with several performed at or *below chance levels*, which is far more consistent with an intentional need to perform poorly (such as malingering) on such measures." Id. ¶ 71 (emphasis in original).

---

[7]     The first Emergency Department visit was on October 31, 2020, and the second Emergency Department visit was on July 8, 2022.  Exs. 222, 223.

44. "In order to further assess [Plaintiff's] personality and emotional functioning," Dr. Schaeffer administered the "Minnesota Multiphasic Personality Inventory, Third Edition (MMPl-3) in Spanish." Id. ¶ 77. However, "[v]alidity scales of the MMPl-3 again raised concerns for gross and exaggerated overreporting of symptoms." Id. ¶ 80. Dr. Schaeffer found the results revealed Plaintiff "had unusual responses that are associated with non-credible memory complaints." Id.

45. Ultimately, Dr. Schaeffer opined based on the records he reviewed and his assessment of Plaintiff that Plaintiff "has not suffered any evidence of a more enduring or permanent traumatic brain injury of any type, and is fully functional in daily life, and able to maintain full-time gainful employment in a food market (owned by he and his wife, drives and handles money and finances) in the Panorama City Area of the San Fernando Valley (Los Angeles) by his own report to me." Id. ¶ 23.

### b. **Dr. Geoffrey Miller**

46. Dr. Geoffrey Miller, a board-certified orthopedic surgeon, reviewed Plaintiff's medical records and opined "[w]hile the medical records do establish a large left sided congenital brain cyst, the clinical timeline and lack of any true objective findings by anyone (except the doctor with secondary gain from injections) does not support a hematoma or brain injury." Miller Decl., ¶ 12. He noted "[b]oth neurosurgeons seen by [Plaintiff] reviewed the 'hematoma' scan and agreed it only showed a pre-existing and longstanding cyst, not an injury from the motor vehicle accident." Id. Additionally, Dr. Miller opined there is no surgical indication for any future surgery based on the fact that "four[] consecutive specialists (two neurosurgeons and two neurologists) found no surgical spine issue" and that Plaintiff has not had any treatment for his spine in two years. Id. ¶¶ 74, 75. Finally, while one

doctor, Dr. Khounganian,[8] had recommended surgery, Dr. Miller rejected Dr. Khounganian's recommendation because he found the recommendation was based on inconsistencies within Dr. Khounganian's own report and unsupported analyses and conclusions.  Id. ¶¶ 76-78, 80-81.

### c.    Dr. Ilan Danan

47.    On June 14, 2023, Dr. Ilan Danan, a neurologist who is board-certified in adult neurology and brain injury medicine, conducted an independent medical examination of Plaintiff.  Danan Decl., ¶ 9.  Dr. Danan reported that in describing the accident, Plaintiff "did now acknowledge a loss of consciousness."  Id. ¶ 12.  As to Plaintiff's current symptoms, Dr. Danan noted Plaintiff presented with a chief complaint of mood related disorders, focusing on anxiety and depression, along with insomnia and "noises in his head."  Id. ¶ 10.  With respect to the buzzing sound in his head, notably, Plaintiff "acknowledged a history of an intermittent 'buzzing sound' before the [accident] that he attributed towards working with noisy machinery well before the accident."  Id. ¶ 70.  Plaintiff "also reported pain-related complaints involving his neck, low back, and head, but stated that his larger concerns are on addressing his anxiety and depression."  Id. ¶¶ 10, 70.

48.    Following his examination and review of Plaintiff's medical records, Dr. Danan opined Plaintiff suffered at worst from a "mild uncomplicated traumatic brain injury, or concussion for which, I believe symptoms ultimately self-resolved, as most tend to do."  Id. ¶ 28.  Dr. Danan ultimately concluded "the risk of permanent disability following an uncomplicated mild TBI is low, with upwards of 90% of patients endorsing complete symptom recovery within three months of the injury," and any claims by Plaintiff of long-term disability are undermined by the fact that

---

8 Dr. Khounganian's report of his findings and recommendations was not entered into evidence.

Plaintiff's "claims are largely subjective with inconsistent histories, generally unremarkable neurologic examinations, and poor patient follow up."  Id. ¶ 42.

### iv.    Lay Witness Testimony

#### a.    Plaintiff's Testimony

49.    Plaintiff testified he worked as a "handyman" prior to the accident – doing stone / concrete work, electrical work, and plumbing.  T1 at 56.  After the accident, however, Plaintiff did not try to return to work due in part to the neck and back pain he was suffering from, but mostly because he was concerned about the balance issues he developed after the accident.  Id. at 80.

50.    Plaintiff testified he currently helps his wife at her store, Pacoima Water.  Id. at 100.  Plaintiff's wife purchased the store three months before the accident, and Plaintiff occasionally works at the store 12 hours a day.  Id. at 91, 101.

51.    Plaintiff testified that after the accident he became depressed, suffered from anxiety, and had thoughts of suicide.  Id. at 89.  He is taking Cymbalta to help with these psychological issues.  Id.  Plaintiff testified he lives in fear following the discovery of the intracranial cyst.  Id. at 93.

#### b.    Carlos Urias, Jr.'s Testimony

52.    Carlos Urias, Jr., Plaintiff's son, testified about his observations of Plaintiff's changes in behavior following the accident.  T1 at 38-47.  Urias, Jr. was the only lay witness to testify for Plaintiff and the only person to offer testimony observing Plaintiff's change in behavior following the accident.  According to Urias, Jr., Plaintiff is not the same following the accident.  Id. at 44.  He described Plaintiff as "not himself" – he is "a little slower" – often stressed and worried.  Id. at 42, 44, 47.  Plaintiff avoids activities like hiking and biking because he and his family "don't want anything to happen to him."  Id. at 44, 47.

v.     **Reasonable Medical Expenses**

a.     **Dr. Neil Godadra**

53.     Dr. Godadra reviewed Plaintiff's past medical bills and provided an itemization of "reasonable past medical charges incurred by [Plaintiff]."  Godadra Decl., ¶ 49.  Godadra opined that "[w]ithin the medical regional probability, the past medical bills are within the standard, and are appropriate," and "[t]he bills are reasonable and consistent with the usual and customary charges in the ZIP Code of treatment."  Id.  To support his conclusion, Dr. Godadra explained he "used the usual, customary, and reasonable 80th percentile as the center for Medicaid services uses this as a marker for Medicare set aside's, which are treatment plans and costs associated with care and management of patients."  Id. ¶ 51.

54.     Dr. Godadra explained: "I am a certified life care planner, and I had a better appreciation of understanding charges and bills once I was trained as a life care planner.  One of the ways that we do it is I use a database called Context 4 Health."  Id. ¶ 80.  "Context 4 Health is the largest database of provider bills and charges that we have in this country, and it represents 70 percent of all bills and charges."  Id. ¶ 81.  Context 4 Health includes a very large collection of fees, contracted fees, HMOs, Medicare, out-of-network insurance, among others."  Id. ¶ 82.

b.     **Lindsay Knutson**

55.     Lindsay Knutson is a Director in the Health Analytics at Berkley Research Group.  Dkt. 62, Declaration of Lindsay Knutson ("Knutson Decl."), ¶ 1.  Part of her professional services include making determination of appropriate rates of reimbursement for healthcare services.  Id. ¶ 2.  She uses "payor and provider data sets, publicly available government data, publicly available state encounter and hospital financial data, as well as private healthcare data, in order to, among other things, prepare damages calculations and analyses for expert reports."  Id. ¶ 1.

56.     Ms. Knutson concluded "the reasonable value of health services is appropriately determined by the market rate, i.e. the amount that willing buyers pay and willing sellers accept in an arm's length transaction." Id. ¶ 17.  "These values reflect market rates and are consequently the most appropriate values to use." Id. She noted Plaintiff's "insurance, access to insurance, any Medicare eligibility, and financial means to pay his medical bills (or lack thereof) is not relevant to my analyses because they have no bearing on the market rate for medical treatment." Id. ¶ 18.

57.     Ms. Knutson explained: "I reviewed the medical bills submitted for Plaintiff's medical care from 10 health care providers. . . . I list information regarding all past bills I have for which I have calculated a reasonable value, including each health care provider, the charges included on the health care provider's bills, and the reasonable value for the services that are identified[.]" Id. ¶ 22.

**vi.     Witness Credibility**

   **a.     Plaintiff**

58.     The Court finds credibility issues with Plaintiff's testimony, which undermine the weight of Plaintiff's subjective complaints.  First, there were inconsistencies as to whether Plaintiff lost consciousness immediately following the collision.  For example, during Plaintiff's first hospital visit on October 31, 2020, he informed doctors he did not lose consciousness following the accident.  See Ex. 222 at 3.  Additionally, during Plaintiff's evaluation with Dr. Hartunian, Plaintiff told Dr. Hartunian he did not lose consciousness following the accident.  See Ex. 225 at 3. However, during Plaintiff's subsequent evaluation with Dr. Obukhoff, Plaintiff stated he briefly lost consciousness following the collision.  T2 at 199.  This detail impacted Dr. Obukhoff's final conclusion regarding the severity of the concussion.  See id. at 199-200.

59.     Further, the Court notes Plaintiff failed to follow treatment recommendations, which undermines his subjective testimony about the severity of his symptoms.  For example, Dr. Obukhoff, Dr. Godadra, and Dr. Grifka each recommended Plaintiff schedule follow-up appointments, but Plaintiff never did.  See, e.g., T2 at 206; T1 at 116-117.

60.     Finally, Plaintiff failed at least two psychometric tests – one with Dr. Schaeffer and one with Dr. Zackler.  As Dr. Schaeffer reported, failing these tests "is a[n] extremely unusual finding."  Schaeffer Decl., ¶ 71.  Failing suggests "a purposive or intentional choice on the part of the examinee and is far more common in cases where a Plaintiff is attempting to intentionally portray 'impairment.'"  Id. ¶ 72.  Notably, Dr. Zackler, Plaintiff's own neuropsychiatrist, also found Plaintiff failed both psychological measures he administered.  Zackler Decl., ¶¶ 24, 25.  The interpretive results from Dr. Zackler's assessments reported Plaintiff "answered an unusually large number of extreme items in the deviant direction; an indiscriminate and exaggerated response pattern is probable," and that Plaintiff's "response style may indicate a tendency to magnify illness, an inclination to complain, or feelings of extreme vulnerability associated with a current episode of acute turmoil."  Id. ¶¶ 27, 28.

61.     Thus, for each of these reasons, the Court finds Plaintiff's credibility is undermined, and therefore, gives less weight to Plaintiff's subjective complaints.

### b.     Wilfredo Escobar

62.     The Court found Wilfredo Escobar to be an honest, candid, and believable witness whose testimony was supported by the evidence.

### c.     Carlos Urias, Jr.

63.     The Court notes that Carlos Urias, Jr., is Plaintiff's son, and therefore, not a truly disinterested witness.  However, the Court found Carlos Urias, Jr., to be an honest, candid, and believable witness.

18

### d.   Expert Witnesses

64.     The Court found each of the expert witnesses – specifically, Dr. Obukhoff, Dr. Zackler, Dr. Ghodadra, Dr. Schaeffer, Dr. Miller, Dr. Danan, and Lindsay Knutson – to be credible and forthright with reasonable and supported conclusions.  However, the Court notes that to the extent some doctors received inconsistent reports of symptoms from Plaintiff, the Court has considered these facts in assessing the reliability of their analyses and conclusions.

## II.

## CONCLUSIONS OF LAW

### A.   JURISDICTION

65.     This is an action brought pursuant to the Federal Tort Claims Act ("FTCA") under 28 U.S.C. § 2675(a).  This Court has jurisdiction under 28 U.S.C. § 1331 and § 1346(b).

66.     Venue is proper in the Central District of California under 28 U.S.C. § 1402(b) because the events giving rise to the subject matter of the Complaint occurred within Los Angeles County, California, and therefore, within the Central District of California.

### B.   FEDERAL TORT CLAIMS ACT AND CALIFORNIA NEGLIGENCE LAW

67.     Plaintiff asserts a single claim for violation of the FTCA alleging Escobar negligently operated his USPS vehicle, which resulted in Plaintiff's injuries.  Dkt. 1.

68.     Under the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.  28 U.S.C. § 2674.  To be cognizable, the claim must arise from the negligent or tortious act of a government employee acting within the scope of his or her employment under circumstances

where the United States, if it were a private individual, would be liable under the law of the state where the claim arose.  28 U.S.C. § 1346(b).

69.     Under the FTCA, the substantive law of the state where the allegedly negligent act occurred applies.  28 U.S.C. § 1346(b)(1).  Here, California law applies because the accident occurred in California.  To establish a negligence claim under California law, Plaintiff must prove the "defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury."  Brown v. USA Taekwondo, 11 Cal. 5th 204, 213 (2021) (internal quotation marks and citation omitted).  "[E]ach person has a duty to use ordinary care and 'is liable for injuries caused by his failure to exercise reasonable care in the circumstances.'"  Cabral v. Ralphs Grocery Co., 51 Cal. 4th 764, 771 (2011) (internal quotation marks and citation omitted).

70.     "Causation is established for purposes of California tort law if the defendant's conduct is a substantial factor in bringing about the plaintiff's injury."  Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co., 5 Cal. 5th 216, 223 (2018), as modified (July 25, 2018) (internal quotation marks omitted).  "The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result."  Ortega v. Kmart Corp., 26 Cal. 4th 1200, 1205 (2001).  "[I]n a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony."  Jones v. Ortho Pharm. Corp., 163 Cal. App. 3d 396, 402 (1985).  "A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action."  Id. at 403.

///

///

20

**C.     DUTY**

71.     Here, Escobar had a duty to use ordinary care in the operation of his postal truck.  Cabral, 51 Cal. 4th at 771.  Escobar testified his postal truck was close to the Camry driven by Plaintiff as he was trying to make a right turn.  T2 at 239.  When Plaintiff stopped at the red light, Escobar hit Plaintiff's car.  Id. at 239, 241.  The USPS accident report noted Escobar engaged in an "unsafe practice[]" of "fail[ing] to check clearance."  Ex. 52 at 11.  Thus, the evidence establishes Escobar's failure to keep a reasonable distance and failure to check the clearance between his vehicle and Plaintiff's vehicle was a breach of the duty of care.

**D.     CAUSATION**

72.     The evidence establishes that Escobar's negligence, and the subsequent accident, was a substantial factor in causing damage to the Camry and some, but not all, of Plaintiff's claimed injuries.[9]

**i.     Property Damage**

73.     With respect to the Camry, the evidence establishes Escobar's negligence caused damage to the rear bumper and undercarriage of the Camry, which resulted in $4,234.26 worth of damages.  T1 at 35.

**ii.     Neck and Back Injuries**

74.     With respect to Plaintiff's injuries, specifically the pain to his neck and back, evidence establishes that within a day of the accident, Plaintiff began to experience pain in his neck and back.  T1 at 71.  On October 19, 2020, two days after the accident, Plaintiff sought treatment from chiropractor, Dr. Demirchian.  Ex. 216. From October 19, 2020 to February 10, 2021, Plaintiff regularly received treatment

---

[9] In Plaintiff's Proposed Findings of Fact and Conclusions of Law, Plaintiff does not request or argue that he is entitled to any economic damages based on property damage to the Camry.  See dkt. 87-1 ¶ 34.

from Dr. Demirchian – receiving care on 35 different occasions.  Miller Decl., ¶ 25; Schaeffer Decl., ¶ 42.  Plaintiff's symptoms improved with chiropractic care, but he continued to have pain in his head, neck, and lumbar spine region.  Schaeffer Decl., ¶ 42.

75.     In December 2020, Plaintiff began pain management treatment with Dr. Nini.  Danan Decl., ¶ 7.l; Schaeffer Decl., ¶ 42; T1 at 83-84.  From December 2020 to July 2021, Plaintiff received multiple injections to address the pain in his neck and spine.  Id.  Plaintiff testified the injections, though painful, eased some of the pain, but did not resolve it completely.  T1 at 84-85.

76.     Notably, however, Plaintiff's last recorded injection treatment was in July 2021.  Schaeffer Decl., ¶ 42.  Plaintiff has not presented any evidence to show he continued to receive any treatment for his neck and back pain after July 2021.  Additionally, as of May 2023, the evidence shows the only medication Plaintiff had been taking since the accident was Tylenol.  See Zackler Decl., ¶ 31.

77.     Thus, the evidence presented establishes Escobar's negligence likely was a substantial cause of Plaintiff's neck and back injuries based on treatment documented through July 2021.

### iii.   Neurocognitive Injuries

78.     The evidence establishes Plaintiff likely suffered from a mild traumatic brain injury or concussion as a result of the car accident, but no injury that would cause long-term cognitive deficits.  Although the October 2020 MRI showed the presence of a thin-sheet bleed, there is no other objective evidence to support a major brain injury resulting from the car accident.  See Schaeffer Decl., ¶¶ 22-26.  Rather, the MRIs and CTs show the presence of a congenital brain cyst – a cyst that was not caused by the accident, but rather something Plaintiff has had since birth.  See Ex. 226 at 4.

79.     Notably, the only expert assessments Plaintiff entered into evidence relevant to any neurocognitive deficits were a November 2020 report from Dr. Harutunian and testimony from Dr. Obukhoff following his November 2020 and December 2020 evaluations of Plaintiff – both of which relied on Plaintiff's inconsistent, self-reported symptoms.  Compare Ex. 225 at 3 (As noted by Dr. Hartunian, Plaintiff "remained conscious" during the accident and "denies vomiting.") with Ex. 226 at 3 (As noted by Dr. Obukhoff, Plaintiff "briefly lost consciousness" and later developed "nausea together with episodes of vomiting."). With the exception of these two expert evaluations, evidence of Plaintiff's neurocognitive deficits was largely based on Plaintiff's own subjective complaints. Moreover, while Dr. Obukhoff appeared to suggest there could be evidence of long-term post-concussion effects, Dr. Obukhoff's analysis and conclusion were largely premised upon Plaintiff's inconsistent and unsupported claim that he briefly lost consciousness following the collision.  See Ex. 226 at 4; T2 at 202.  Thus, the Court gives less weight to Dr. Obukhoff's opinion about the severity of Plaintiff's concussion.

80.     Moreover, Defendant presented expert testimony from both Dr. Danan and Dr. Schaeffer that undermined Plaintiff's claim of lasting neurocognitive effects from the accident.  As Dr. Danan opined, "[a]t worst, [Plaintiff] suffered a mild uncomplicated traumatic brain injury, or concussion, for which, I believe symptoms ultimately self-resolved, as most tend to do."  Danan Decl., ¶ 28.  Dr. Danan further reported "the risk of permanent disability following an uncomplicated mild TBI is low, with upwards of 90% of patients endorsing complete symptom recovery within three months of the injury."  Id. ¶ 42.  Undermining any claims of long-term disability is the fact that Plaintiff's "claims are largely subjective with inconsistent histories, generally unremarkable neurologic examinations, and poor patient follow up."  Id.

81.     Dr. Schaeffer similarly opined "the proximate medical records from either of the two initial Emergency Department visits[10] failed to identify any claimed or objectively documented abnormalities of a neurological, cognitive, or of a mental status nature." Schaeffer Decl., ¶ 60. Further, based on his evaluation of Plaintiff, "there appeared to be no other current objective documentation of ongoing Cognitive or Psychiatric injuries, conditions, or deficits, that would have been caused by, or associated with, the continuing sequelae of a traumatic brain injury of any severity[.]" Id. ¶ 24.

82.     As to Plaintiff's headaches and balance issues, the testimony from Dr. Obukhoff, Dr. Schaeffer, and Dr. Danan establishes these symptoms were likely the result of the mild concussion following the collision. However, with respect to the tinnitus, there is evidence that Plaintiff suffered from issues with buzzing noises in the past due to his work as a handyman. Danan Decl., ¶ 70. Hence, at most, there is evidence the buzzing noise was aggravated by the collision.

83.     Thus, based on the evidence presented, Escobar's negligence was a substantial cause of a concussion or mild traumatic brain injury, but there is no evidence that Escobar's negligence caused any lasting effects to Plaintiff's neurocognitive health.

### iv.   **Psychological Injuries**

84.     To the extent Plaintiff claims anxiety and psychological distress caused by the discovery of the cyst is a result of the accident, the evidence does not establish the requisite causation. "[L]egal responsibility must be limited to those causes which are so close to the result, or of such significance as causes, that the law is justified in making the defendant pay." Kumaraperu v. Feldsted, 237 Cal. App. 4th 60, 68 (2015).

---

[10]     The first Emergency Department visit was on October 31, 2020, and the second Emergency Department visit was on July 8, 2022.

85.     Here, Plaintiff's anxiety caused by the discovery of his congenital brain cyst is too attenuated from Escobar's negligent conduct to reasonably hold Escobar, and by extension Defendant, accountable.  Cabral, 51 Cal. 4th at 780 (observing an injury is too indirect and attenuated from a negligent act when "there is no logical cause and effect relationship between that negligence and the harm suffered . . .") (quoting Bryant v. Glastetter, 32 Cal. App. 4th 770, 782 (1995)).  Thus, Plaintiff has failed to establish Escobar's conduct was a substantial factor in causing Plaintiff's anxiety and related emotional distress due to the discovery of the cyst.

E.     **DAMAGES**

    i.     **Past and Future Medical Expenses**

86.     "A plaintiff may recover as damages for past medical expenses no more than the reasonable value of the services provided."  Ochoa v. Dorado, 228 Cal. App. 4th 120, 134 (2014) (citing Howell v. Hamilton Meats & Provisions, Inc., 52 Cal. 4th 541, 555 (2011)).  "Such damages are limited to the lesser of (1) the amount paid or incurred for past medical services, and (2) the reasonable value of the services."  Id. "[T]here can be significant disparities between the amounts charged by medical providers and the costs of providing services, the price of a particular service can vary tremendously . . . from hospital to hospital in California, and a medical care provider's billed price for particular services is not necessarily representative of either the cost of providing those services or their market value."  Id. at 135 (internal citations and quotation marks omitted).  In addition, a plaintiff may recover future medical expenses if plaintiff establishes "that from all the evidence, including the expert testimony, if there be any, it satisfactorily appears that such disability will occur with reasonable certainty."  Garcia v. Duro Dyne Corp., 156 Cal. App. 4th 92, 97-98 (2007).

87.     As to past medical expenses, both Dr. Ghodadra and Lindsay Knutson reviewed Plaintiff's medical bills and provided what they assessed to be a reasonable value for each healthcare provider.  Dr. Ghodadra's amounts appear to be based primarily off the amounts billed, which "is not necessarily representative of either the cost of providing those services or their market value."  <u>Ochoa</u>, 228 Cal. App. 4th at 135; <u>see</u> Ghodadra Decl., ¶ 49.  Although he asserts he "used the usual, customary, and reasonable 80th percentile as the center for Medicaid services," he fails to offer any explanation for the Court to find the billed amounts are a reasonable value of the services received.

88.     In contrast, Lindsay Knutson's costs were calculated "by applying an adjustment factor to data collected and published by the United States Department of Health and Human Services" to identify a reasonable market rate for each service. Knutson Decl., ¶ 26.  The Court, thus, finds Ms. Knutson's calculation of $57,022.01 for Plaintiff's past medical expenses to be a reasonable value for the services he received.

89.     As to future medical expenses, Plaintiff has failed to establish the need for future treatment with reasonable certainty.  First, Plaintiff has failed to seek out injection or pain management treatment since 2021.  <u>See</u> Schaeffer Decl., ¶ 42; Miller Decl., ¶¶ 74, 75.  Hence, the evidence does not support continued injection treatment is reasonably certain or necessary.  Second, because there is no evidence supporting injection treatment, there is no evidence to warrant Plaintiff pursuing surgery, as surgery was the proposed option if injection treatments failed.  <u>See</u> Ghodadra Decl., ¶ 23. Finally, because the evidence has not established the accident was a substantial factor causing Plaintiff's anxiety – instead the evidence shows Plaintiff's anxiety was caused by the discovery of the cyst – future psychotherapy treatment as a result of the accident is also not warranted or supported.  <u>See</u> Zackler Decl., ¶¶ 38, 41.

###### ii.   __Noneconomic Damages__

90.     In California, a plaintiff who has established liability may recover noneconomic damages for a wide variety of harms, including emotional distress and pain and suffering, which may include not only physical pain but also "fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal." Capelouto v. Kaiser Found. Hosps., 7 Cal. 3d 889, 892-93 (1972).  The test for determining noneconomic damages "is one of reasonable compensation." Hilliard v. A. H. Robins Co., 148 Cal. App. 3d 374, 412 (1983).  A plaintiff may recover for future noneconomic damages that are reasonably certain to occur.  Garcia, 156 Cal. App. 4th at 97.

91.     Plaintiff testified that he was in substantial pain and suffered from headaches and dizziness following the collision and that he has suffered emotional distress from not being able to work and from the deteriorating relationship with his wife. T1 at 56.  In light of Plaintiff's testimony about the physical pain he has endured from his neck and back and the records that establish he endured two years of neck and spine injections in an attempt to ease his pain, the Court finds there is evidence to warrant a noneconomic award for pain and suffering.  Capelouto, 7 Cal. 3d at 892-93.  Plaintiff's testimony about the impact the accident has had on his relationship with his wife and his own emotional distress as a result of his injuries and subsequent loss of work provides additional support for an award of noneconomic damages.

92.     Considering the evidence and looking at other cases as benchmarks,[11] the Court finds the government's proposal of $6,000 for past pain and suffering to be

---

[11] See, e.g., Seferaj v. United States, No. CV 21-6928-DMG-AFMx, 2023 WL 5530026, at *6 (C.D. Cal. Aug. 28, 2023) (awarding $18,000 in non-economic damages

inadequate, but Plaintiff's proposal of $1,000,000 is excessive.  Dkts. 86, 87.  Based on the evidence presented, an award of $27,000 for past noneconomic damages of pain and suffering is reasonable and supported.

93.     Lastly, the Court finds sufficient evidence has been presented that Plaintiff may continue to suffer from headaches and dizziness.  However, the evidence presented has shown that Plaintiff is largely able to manage these symptoms with, at most, over the counter medication like Tylenol.  See Zackler Decl., ¶ 33.  Accordingly, the Court finds an additional $6,000 for future pain and suffering to be reasonable compensation in this case.

///

///

---

for back, neck, and leg pain that had continued several years after an accident where a postal truck struck plaintiff's driver door and injured Plaintiff); Ream v. United States, No. 17-1141-RAJ, 2020 WL 1303429, at *1-2, 6 (W.D. Wash. Mar. 19, 2020) (awarding $100,000 in noneconomic damages for roughly seven years of past pain, suffering, and disability where plaintiff experienced neck and lower back pain, and needed assistance tying her shoes, putting on clothes, bathing, and going to the bathroom); Penny v. State Farm Mut. Auto. Ins. Co., No. C18-5195-JLR, 2020 WL 6559288, at *4-5, 12 (W.D. Wash. Nov. 9, 2020) (awarding $92,000 in noneconomic damages for one year of pain and suffering and loss of enjoyment of life where automobile accident caused a mild traumatic brain injury; cervical, thoracic, lumbosacral, bilateral knee, and bilateral ankle sprain and strain injuries; and the exacerbation of preexisting writ and thumb pain); Peltier v. United States, No. CV 16-00774-ODW-SPx, 2017 WL 4621544, at *2, 5 (C.D. Cal. Oct. 16, 2017) (awarding $2,500 in noneconomic damages for back pain, suffering, and anxiety stemming from minor rearend collision); Cantu v. United States, No. CV 14-00219-MMM-JCGx, 2015 WL 4720580, at *2-5, 13-15, 36 (C.D. Cal. Aug. 7, 2015) (awarding $15,000 in noneconomic damages for past mild back, neck, and shoulder pain stemming from a moderately severe collision where plaintiff's automobile spun clockwise and rolled onto its roof; plaintiff remained secured in his seat and walked away from the wreckage).

# III.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court finds Plaintiff's damages include $57,022.01 in medical expenses, $27,000 in past noneconomic harm, and $6,000 for future noneconomic harm for a total of $90,022.01.


Dated:  May 13, 2024

_____
HONORABLE KENLY KIYA KATO
United States District Judge